**Nicholas J. Henderson, OSB No. 074027**
Email: nhenderson@portlaw.com
Motschenbacher & Blattner, LLP
117 SW Taylor Street, Suite 200
Portland, Oregon 97204-3029
Telephone: (503) 417-0508
Facsimile: (503) 417-0501

      Of Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| THE LANCE AND LINDA NEIBAUER JOINT TRUST, by and through LANCE NEIBAUER, as trustee, <br><br>       Plaintiff, <br><br>     vs. <br><br> MICHAEL J. KURGAN, an individual, <br><br>       Defendant. | Case No. 6:14-cv-01192-MC <br><br> PLAINTIFF'S MOTION TO COMPEL AND MOTION FOR ORDER TO SHOW CAUSE WHY DEFENDANT MICHAEL KURGAN SHOULD BE HELD IN CONTEMPT |

## <u>RULE 7-1 COMPLIANCE</u>

The Attorney for Plaintiff hereby certifies that he has made a good faith effort to confer with Defendant to resolve the subject of this motion, but was unable to resolve the dispute.

## <u>LR 7-2 and 26-3(b) CERTIFICATION</u>

This brief complies with the applicable word count and page count limitations under LR7-2(b) and 26-3(b) because the Memorandum contains 1,795 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

PAGE 1 – PLAINTIFF'S MOTION FOR ORDER TO SHOW CAUSE
{00063700:1}

## MOTION

Plaintiff The Lance and Linda Neibauer Joint Trust, by and through Lance Neibauer, as Trustee ("Plaintiff"), respectfully requests that this Court enter an order: 1) compelling Defendant Michael Kurgan ("Defendant") to respond to questions posed at his debtor's exam for which he has improperly asserted his Fifth Amendment right against self-incrimination; and 2) setting a hearing for the Defendant to appear and show cause, if any, why he should not be found in civil contempt of the Court's Order entered on December 6, 2017 (Dkt. No. 95) (the "December Order"). Should the Court find that Defendant has violated the December Order, the Court should impose compensatory civil sanctions by ordering that Defendant pay Plaintiff's attorney's fees and impose a coercive civil sanction of an escalating monetary penalty that converts to imprisonment until the Contemnor purges the contempt. This motion is supported by the Declaration of Nicholas J. Henderson (the "Henderson Decl.") filed herewith, the pleadings and papers on file herein, and the below Memorandum of points and authorities.

## MEMORANDUM

### I.  INTRODUCTION

This is the second Motion for Contempt and Motion to Compel brought by the Plaintiff to force the Defendant's compliance with the Plaintiff's regular and usual post judgment discovery efforts. In the Court's previous Order finding the Plaintiff in contempt, the Defendant was ordered to fully and accurately respond to the Interrogatories posed to him and to sit for a judgment debtor exam. Order Granting Motion for Contempt, December 6, 2017, [Dkt. No. 96] (the "December Order"). The Plaintiff was awarded $40,538.50 in fees and $3,409.91 in costs as a sanction. Order Granting Plaintiff's Motion for Attorney's Fees, May 8, 2018 [Dkt. No. 103].

After the December Order was entered, the Defendant delivered supplemental interrogatory responses and sat for a deposition. *See* Declaration of Nicholas J. Henderson Ex 1 (the "Supplemental Responses")  and Ex. 2 (the "Deposition Transcript"). During the course of the Deposition, the Defendant continually—and as argued below, wrongfully—refused to answer questions on the basis of his Fifth Amendment right against self-incrimination. By refusing to answer the questions posed during the Deposition, the exam was functionally useless.

The Defendant improperly asserted his Fifth Amendment right against self-incrimination to create the appearance of compliance with the Court's December Order. He attended the deposition, but continued his past bad faith gamesmanship by frivolously asserting privilege and refusing to answer. In response, the court should: 1) Order that the Defendant's assertion of privilege is improper and that he should answer the questions posed to him, as well as any follow up questions and 2) Order that the Defendant be held in contempt for his failure to materially participate in the Debtor's exam as required by the December Order.

## II.  FACTUAL BACKGROUND AND PROCEDURAL POSTURE

The Plaintiff obtained a judgment against the Defendant in December 2014, and has been in the process of executing on that judgment for the past three and a half years. In order to facilitate that process, Plaintiff served Defendant with document requests and interrogatories and has attempted to schedule the Defendant's deposition, all for the specific purpose of identifying Defendant's assets and ability to pay the judgment. As was previously outlined in Plaintiff's Motion to Compel Production of Documents (Dkt. No. 63), Defendant refused to comply with Plaintiff's production requests, citing a discovery stay previously issued by the Court during the underlying litigation while the Court considered Plaintiff's Motion for Summary Judgment. On February 12, 2016, the Court entered an Order, granting Plaintiff's Motion to Compel Production

PAGE 3 –  PLAINTIFF'S MOTION FOR ORDER TO SHOW CAUSE
{00063700:1}

of Documents (the "February Order"). The Defendant completely ignored the February Order, refused to produce any of the documents or interrogatory answers that he was ordered to provide, and has refused to schedule his deposition. In response, the Plaintiff filed a Motion to Show Cause, and the Court entered the December Order finding the Defendant in contempt and ordering him to respond to the interrogatories and to sit for a debtor's exam.

## III. ARGUMENT

### A. The Defendant Should be Compelled to Answer the Questions Posed to Him at His Deposition

The Federal Rules of Civil Procedure provide that any party to a civil action is entitled to all information relevant to the subject matter of the action unless the information is privileged. FRCP 26(b)(1). The privilege against self-incrimination may be invoked in civil as well as criminal proceedings. *Kastigar v. United States*, 406 U.S. 441, 445 (1972), *Campbell v. Gerrans*, 592 F.2d 1054, 1057 (9th Cir. 1979). Through the operation of both the Federal Rules and the Constitution, a party is shielded from compulsory discovery in a civil action if a risk of self-incrimination is involved.  However, there are limits to this protection.

Whether the Court can compel the Defendant to answer a specific question and can impose a contempt sanction depends largely on whether the Defendant justified his assertion of the Fifth Amendment privilege. For the privilege to be properly asserted it must be "evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman v. United States*, 341 US 479, 486–87 (1951) "(T)he privilege normally is not asserted properly by merely declaring that an answer will incriminate." *Brunswick Corp. v. Doff*, 638 F.2d 108, 110 (9th Cir. 1981). The trial court must make this determination from the facts as well as from the court's "personal perception of the peculiarities

PAGE 4 – PLAINTIFF'S MOTION FOR ORDER TO SHOW CAUSE
{00063700:1}

of the case." *Id.* at 487. If no threat of self-incrimination is evident, the defendant then bears the burden of showing the danger of incrimination. *United States v. Neff*, 615 F.2d 1235, 1240 (9th Cir.).

At the start of the deposition, the Defendant's attorney stated on the record that he had "gone ahead and looked at a couple of documents that were filed in the case, including Judge McShane's order, and based upon some findings in there, it struck me that there would be a number of questions that would likely be asked today where it would be advisable for Mr. Kurgan to invoke his Fifth Amendment privilege." Deposition Transcript 5:6–5:12. Thereafter, the Defendant asserted his Fifth Amendment privilege in response to approximately half of the questions posed to him without offering further elaboration as to the basis of his assertion. *See* table *infra.* The Plaintiff objected timely to the assertion of privilege. Deposition Transcript 14:21.

A witness may not claim the privilege of the Fifth Amendment out of fear that he will be prosecuted for perjury for what he is about to say. *United States v. Partin*, 552 F.2d 621, 632 (5th Cir. 1977). The shield against self-incrimination in such a situation is to testify truthfully, not to refuse to testify on the basis that the witness may be prosecuted for a lie not yet told.

The Defendant asserted his Fifth Amendment rights and refused to answer 67 questions in the course of his deposition. The table below lists all of the questions to which no answer was provided on the basis of the Fifth Amendment.

| Question | Answer | Page |
|---|---|---|
| What is your residence address? | I am going to decline to answer that and assert my Fifth Amendment. | 6:8 |
| Do you rent any real property currently? | I'm going to decline to answer that under the Fifth Amendment. | 6:14 |
| Are you currently employed? | I decline to answer that on the Fifth. | 6:18 |

| Question | Answer | Page |
|---|---|---|
| And did you complete this set of interrogatories yourself? | I assert the Fifth amendment. | 8:14 |
| Did you participate in the preparation of these interrogatories? | I assert the Fifth Amendment. | 8:17 |
| Is all of the information in this document marked as Exhibit 3 true and correct, to the best of your knowledge? | I'm going to assert the Fifth Amendment. | 8:20 |
| Is that your signature? | I'm going to assert the Fifth Amendment. | 9:3 |
| And Interrogatory No. 1 asks for your full name, your social security number, and your current residential address. On that page, it lists 134 Rutland 11 Boulevard, West Palm Beach, Florida 33405. Is that your current residence address? | I assert the Fifth Amendment. | 9:8 |
| Have you ever resided at 134 Rutland Boulevard, West Palm Beach, Florida 33405? | I assert the Fifth Amendment. | 9:14 |
| Have you ever entered into a lease agreement regarding that location? | I'm going to assert Fifth Amendment. | 9:17 |
| Are you currently a chief executive and operating officer? | I'm going to assert the Fifth. | 9:25 |
| For the job title listed here, that you said is correct, what company were you a chief executive, slash, operating officer for? | I assert the Fifth. | 10:3 |
| Do you currently receive a salary from any source? | I assert the Fifth. | 10:7 |
| Do you currently own stock in Service Wing Healthcare? | I assert the Fifth. | 10:21 |
| What about Service Wing Solutions? | I assert the Fifth. | 10:24 |
| Precision Approach? | I assert the Fifth. | 11:2 |
| And Matseco? | I assert the Fifth. | 11:3 |
| When did it cease operation? | I take the Fifth. | 11:19 |
| When did it begin operations? | I assert the Fifth | 12:3 |
| How many shareholders did Service Wing Healthcare have when it was organized? | I'm going to assert the Fifth. | 12:5 |
| So what is Service Wing Healthcare doing to pursue litigation to recover its investment? | That's the Fifth, and it's also attorney/client. | 12:25 |
| Who is Service Wing Healthcare's attorney | Again, Fifth and attorney/client | 13:7 |
| And you are the shareholder in Service Wing Healthcare? | I assert the Fifth. | 13:20 |
| For Service Wing Healthcare's investment that you described, what is the investment? | I'm going to take the Fifth. | 13:24 |
| Is it your understanding that there are 20 million shares of Service Wing Healthcare outstanding? | I'm going to decline to answer that on the Fifth. | 14:13 |

| Question | Answer | Page |
|---|---|---|
| Mr. Kurgan, how many shares in Service Wing Healthcare, Incorporated, do you currently own? | I'll assert the Fifth. | 15:10 |
| Have you ever owned shares in that company before? | I'll assert the Fifth. | 13:13 |
| Assuming you acquired shares in Service Wing Healthcare, Incorporated, did you inquire them in your own name or jointly with your wife? | I'll assert the Fifth. | 13:16 |
| I apologize if I already asked this. Mr. Kurgan, do you have a current source of income? | I'm going to decline to answer that on the Fifth. | 17:12 |
| Do you currently own any stocks in corporations? | I decline to answer that on the Fifth. | 17:16 |
| Are you an officer of any corporation? | I decline to answer that on the Fifth. | 17:24 |
| Are you a director of any corporation? | I will assert the Fifth. | 18:1 |
| Okay. Please tell me about joint accounts. | I'm going to assert the Fifth on that. | 18:22 |
| Mr. Kurgan, does anyone owe you money? | I assert the Fifth. | 18:24 |
| Mr. Kurgan, how do you pay for your ongoing living expenses? | I assert the Fifth. | 19:5 |
| How have you paid for your living expenses in the last year? | I assert the Fifth. | 19:8 |
| Who pays the premiums for that policy? | I assert the Fifth on that. | 20:20 |
| Mr. Kurgan, have you filed tax returns in the last 4 years? | I assert the Fifth. | 20:24 |
| Have you owned any automobiles in the last 4 years? | I assert the Fifth. | 21:2 |
| Mr. Kurgan, do you have any credit cards? | I assert the Fifth. | 21:5 |
| Other than the judgment that you owe to my client, do you have any other debts that you owe? | I'm aware of other judgments in the public record, and I would assert the Fifth of any other private debts that I have. | 21:21 |
| Did you purchase a vehicle with a loan from First Florida Credit Union? | I assert the Fifth. | 22:21 |
| Mr. Kurgan, do you have any intention to pay my client's judgment? | Under advice of counsel, I'm going to assert the Fifth. | 22:24 |
| Do you have sufficient assets to pay my client's judgment? | I truly did want to answer that question, but under the advice of counsel, I'm going to assert the Fifth. | 23:3 |
| Am I correct that you used to own a 2011 Land Rover Range Rover? | I assert the Fifth. | 23:20 |
| Have you ever leased a Mercedes-Benz? | I assert the Fifth. | 24:4 |
| Have you leased any vehicles in the last 4 years? | I assert the Fifth. | 24:6 |
| What is Precision Approach? | I'm going to assert the Fifth. | 24:9 |

PAGE 7 – PLAINTIFF'S MOTION FOR ORDER TO SHOW CAUSE
{00063700:1}

| Question | Answer | Page |
|---|---|---|
| Was that your response to Interrogatory No. 21? | I assert the Fifth. | 25:2 |
| At the time that the Exhibit 3 was sent back to me, by you, did you own stock in those four companies? | I assert the Fifth. | 25:5 |
| Have you ever owned stock in Precision Approach? | I assert the Fifth | 25:9 |
| Does Precision Approach currently operate? | I'm going to assert the Fifth. | 25:12 |
| Does Precision Approach have regular revenue? | I assert the Fifth. | 25:14 |
| Are you a director or officer for Precision Approach? | I assert the Fifth. | 25:16 |
| How long have you lived in Florida? | I decline to answer that and assert the Fifth. | 27:6 |
| Where did you live before you moved to Florida? | I decline to answer that and assert the Fifth. | 27:9 |
| What did you do with the funds that you received, when you sold the property at 265 North Shore Drive? | I assert the Fifth. | 27:25 |
| What is your relationship to Richard Pickett? | I'm going to assert the Fifth. | 28:10 |
| What is your relationship to the other plaintiffs in the lawsuit? | I haven't had time to review it, but I'll assert the Fifth | 28:14 |
| Who is Gene Lee? | I'm going to assert the Fifth. | 28:16 |
| Are you currently represented by the Law Offices of David Harris? | Based on the allegation in Judge McShane's order, we're going to invoke the Fifth. | 29:17 |
| Service Wing Solutions was hired by Pitney Bowes? | I assert the Fifth at this point.  But I never was personally hired by any company for Pitney Bowes. | 33:5 |
| What is your role in Service Wing Solutions? | I assert the Fifth | 33:9 |
| Is Service Wing Solutions still operational? | I think this was asked and answered, but I assert the Fifth and let my previous answer stand. | 33:11 |
| Is Matseco still operational? | I assert the Fifth. | 33:14 |
| Have you applied for any loans or lines of credit in the last 4 years? | I assert the Fifth. | 33:18 |
| Have you made payments on any loans in the last 48 months? | I assert the Fifth. | 33:24 |

The Defendant's refusal to answer questions on such a broad range of topics seriously

calls into question his genuine and good faith assertion of the privilege. He refused to answer

general questions—"How long have you lived in Florida"—and specific questions—"Have you

applied for any loans or lines of credit in the last 4 years?" He refused to answer questions about general assets— "Have you owned any automobiles in the last 4 years?"—and questions that could lead to the discovery of hidden assets—"Mr. Kurgan, have you filed tax returns in the last 4 years?" Indeed, according to the Defendant, revealing how his most basic needs of food—"Mr. Kurgan, how do you pay for your ongoing living expenses?"—and shelter—"What is your residence address?"—are protected by the Fifth amendment. He has even refused to confirm the presence of his signature on the amended Interrogatory responses. Deposition Transcript at 9:3 ("Q: Is that your signature? A: I'm going to assert the Fifth Amendment.")

It is not evident how each question to which the Defendant asserted the Fifth Amendment is potentially injurious. Other than the oblique reference to the Court's findings in the December Order, no explanation for the Defendant's refusal to answer is given. It is also not evident how the findings in the December Order create a basis for the lawful assertion of the Defendant's Fifth Amendment right during the course of his deposition. In addition to finding that the Defendant had willfully evaded compliance with the Court's previous order, the Court found that the Defendant's objections to the initial interrogatory requests were made too late and were therefore waived. December Order 5. In comparing the initial and revised interrogatory responses, there are few if any substantive changes between the two sets of answers other than to answer questions to which there was a previously overruled objection.

It is plainly apparent that the Defendant's refusal to answer nearly all of the meaningful questions at his deposition has defeated the Court's December order requiring him to appear at a deposition. Last December, the court noted that it had "grown weary of Kurgan's gamesmanship" after evading compliance for the previous 10 months. December Order at 4. Despite this strong admonition and the threat of requiring the Defendant's appearance in court

PAGE 9 – PLAINTIFF'S MOTION FOR ORDER TO SHOW CAUSE
{00063700:1}

with the assistance of the United States Marshal, the Defendant's games continue. It is clear that the court's prior order compelling the Defendant to sit for a deposition and imposing the Plaintiff costs in this action was not enough to bring about meaningful compliance by the Defendant. The Court should issue an order requiring the Defendant to appear in Court in person in the District of Oregon, with the assistance of the United States marshals if necessary, to sit for a deposition. Requiring the Defendant's attendance with the immediate possibility of confinement for his further dilatory conduct is necessary to wrest the truth from him.

**B.  The Defendant Should be Held in Contempt for His Continual Failure to Follow this Court's Orders.**

Courts have several sources of authority to hold non-compliant parties in civil contempt. First, courts may rely on their inherent power to hold a party in civil contempt in order to enforce compliance with lawful court orders. *Spallone v. United States*, 493 U.S. 265, 276 (1990); *Shillitani v. United States*, 384 U.S. 364, 370 (1966). Second, a finding of civil contempt may be premised on 18 U.S.C. § 401(3), which provides that "[a] court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as . . . [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." *See also United States ex rel. Shell Oil Co. v. Barco Corp.*, 430 F.2d 998, 1000 (8th Cir. 1970) (18 U.S.C. § 401(3) provides "general statutory authority for . . . both civil and criminal contempt sanctions"); *Twelve John Does v. District of Columbia*, 855 F.2d 874, 876 n.14 (D.C. Cir. 1988). "[W]hen a court imposes fines and punishments on a contemnor, it is not only vindicating it's legal authority to enter the initial court order, but it is also seeking to give effect to the law's purpose of  modifying the contemnor's behavior to conform to the terms required in the order." *Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 827 (1994) (*quoting Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 635 (1988)).

To hold a party in contempt, a court must find by clear and convincing evidence that the party violated a specific and definite order and that it had sufficient notice of its terms and the fact that it would be sanctioned if it did not comply. *See In re Dyer*, 322 F.3d 1178, 1190–91 (9th Cir.2003) ("The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court."). "In civil contempt proceedings[,] the contempt need not be willful." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949). The standard is met here.

The evidence discussed above establishes by clear and convincing evidence that Defendant has disobeyed the Court's December Order. The December Order required the Defendant to sit for a deposition, which was effectively defeated because the Defendant refused to answer any material question based on a bad faith assertion of the Fifth Amendment privilege. There was no justifiable basis for Defendant to violate the Court's December Order.

### C. The Court Should Order Civil Sanctions and Order Defendant/Contemnor to Pay Additional Attorney Fees Incurred by Plaintiff.

A court's contempt powers are broadly divided into two categories: civil contempt and criminal contempt. *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 628 (9th Cir. 2016). In distinguishing between criminal and civil contempt, the Court must look to the sanction's "character and purpose." *Id*. at 629, *citing Bagwell*, 512 U.S. at 827. "The purpose of civil contempt is coercive or compensatory, whereas the purpose of criminal contempt is punitive." *Id*. (internal citations omitted). The civil contemnor is said to "carr[y] the keys of his prison in his own pocket," whereas the criminal contemnor "is furnished no key, and he cannot shorten the term by promising not to repeat the offense." *Id*., *quoting Bagwell*, 512 U.S. at 828–29.

A court may wield its civil contempt powers for two separate and independent purposes: (1) "to coerce the defendant into compliance with the court's order"; and (2) "to compensate the complainant for losses sustained." *Id.*, *quoting United States v. UMWA*, 330 U.S. 258, 303–04 (1947); *see also Ohr ex rel. NLRB v. Latino Express, Inc.*, 776 F.3d 469, 479–80 (7th Cir.2015) ("A civil contempt order can serve to coerce a party to obey a court order, or it can be intended to compensate a party who has suffered unnecessary injuries or costs because of contemptuous conduct." (collecting cases)); "The test ... is 'what does the court primarily seek to accomplish by imposing the sanction?' " *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir.1983) (*quoting Shillitani*, 384 U.S. at 370). Civil compensatory sanctions are remedial, and typically take the form of unconditional monetary sanctions, whereas coercive civil sanctions, intended to deter, generally take the form of conditional fines. *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 444 (1911). A coercive civil penalty is, by nature, "avoidable through obedience." *See Bagwell*, 512 U.S. at 827. Thus, an imprisoned contemnor "'carries the keys of his prison in his own pocket.' He can end the sentence and discharge himself at any moment by doing what he had previously refused to do." *Id.* at 442.

In the December Order, the Court held that "the proper sanction is that Kurgan is liable for all fees and costs plaintiff incurred in bringing this motion and in seeking to obtain discovery under rule 69." December Order at 4. The Court awarded the Plaintiff this sanction on May 8, 2018. Order Granting Plaintiff's Motion for Attorney's Fees [Dkt. No. 103]. Clearly, the sanction awarded was not sufficient to ensure good faith compliance with the December Order.

The Plaintiff only seeks to enforce its rights and to collect its judgment and coercive sanctions are best situated to achieve that goal. Defendant has been violating the February Order since it was entered on February 12, 2016, and his attendance at his long overdue deposition did

not cure his contempt. The Defendant's actions demonstrate his disregard and disrespect for the judicial system.

The Defendant's past conduct demonstrates that accumulating civil sanction penalties, without more, is unlikely to be successful in coercing compliance. As a result, Plaintiff recommends that the Court impose an escalating monetary civil contempt penalty that converts to imprisonment if the Contemnor does not fully comply with the December Order. Specifically, the Plaintiff proposes that the Court again award the Plaintiff its costs and attorney's fees in enforcing compliance with the Court's Orders (to be determined upon motion in accordance with Fed. R. Civ. P. 54(d)(2)), award the Plaintiff an additional $5,000 as a sanction for the Defendant's bad faith conduct, and impose an escalating monetary sanction in the following amounts, until the Defendant fully complies with the Court's previous Orders:

- Days 1-7: $500 per day
- Day 8-14: $1,000 per day
- Day 15-21: $2,000 per day
- Day 22-28: $5,000 per day
- Day 28 and beyond: $10,000 per day, plus imprisonment

Given the Defendant's long-lasting refusal to comply with previous Orders, irrespective of the accumulation of civil penalties, an escalating monetary civil contempt penalty that converts to imprisonment is an appropriate coercive civil contempt sanction that should remain in place until the Contemnor purges the contempt.

**CONCLUSION**

Plaintiff, The Lance and Linda Neibauer Joint Trust, by and through Lance Neibauer, as Trustee, respectfully requests that this Court enter an order 1) compelling the Defendant to appear at court in person in the District of Oregon, to sit for a deposition and 2) setting a hearing for Defendant Michael Kurgan to appear and show cause, if any, why he should not be found in

civil contempt.  Should the Court find that Defendant has violated the Court's Order, the Court should impose compensatory civil sanctions by ordering that he pay Plaintiff's attorney fees and assess a coercive civil sanction involving an escalating monetary civil contempt penalty that converts to imprisonment until Defendant purges the contempt.

Dated:  June 26, 2018

M̲OTSCHENBACHER & B̲LATTNER, LLP

/s/ Nicholas J. Henderson
Nicholas J. Henderson, OSB #074027
Of Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2018, I served the foregoing PLAINTIFF'S MOTION TO COMPEL AND MOTION FOR ORDER TO SHOW CAUSE WHY DEFENDANT MICHAEL KURGAN SHOULD BE HELD IN CONTEMPT:

Michael J. Kurgan
6538 Collins Ave. Unit 288
Miami Beach, FL 33141
(858) 408-9330
PRO SE DEFENDANT

**[X] Via First Class Mail**

[   ] Via Facsimile

[  ] Via Hand Delivery

[   ] Via ECF Notification

**[X]  Via Electronic Mail to:  n461bb@gmail.com**

DATED: June 26, 2018

MOTSCHENBACHER & BLATTNER, LLP

/s/ Mary Perry
Mary Perry, Legal Assistant
Of Attorneys for Plaintiff

PAGE 1 – CERTIFICATE OF SERVICE
{00063700:1}